IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Marco Specialties Inc., | C/A No. 3:12-cv-1274-JFA |
| Plaintiff/Counter Defendant, | |
| vs. | |
| Legacy Circuit Enterprises LLC, f/k/a Legacy Circuit Upgrades, LLC, | **ORDER ON DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** |
| Defendant/Counter Claimant. | |

**I.     INTRODUCTION**

This matter is before the Court on the motions of defendant Legacy Circuit Enterprises (LCE) for summary judgment on both plaintiff Marco Specialties, Inc.'s (Marco's) claims and on its counterclaim. *See* ECF Nos. 41, 42. In its Complaint, Marco asserted claims for breach of contract, breach of contract accompanied by a fraudulent act, and civil conspiracy, and it also sought a temporary restraining order (TRO).[1] LCE answered and asserted, among other counterclaims, a counterclaim for breach of contract. In its response in opposition to LCE's motion for summary judgment, Marco abandoned its claim for civil conspiracy and acknowledged that it was no longer seeking a TRO. Therefore, this order only addresses the pending breach of contract claims.

The Court has reviewed the record and the memoranda of counsel and considered the arguments presented at a hearing held on January 11, 2013. For the reasons set forth below, the

---

[1] The request for TRO was the subject of a motion in the original state court action. After removal, LCE received notice of the action and the motion, and this Court converted Marco's motion for TRO into one for a preliminary injunction. The Court heard arguments from the parties' counsel on May 30, 2012. On May 31, 2012, the Court denied the motion for preliminary injunction. *See* ECF No. 16.

1

Court grants, in part, and denies, in part, LCE's motion for summary judgment on Marco's claims and denies LCE's motion for summary judgment on its counterclaims.

## II.   RELEVANT FACTUAL HISTORY

Marco is a family-owned, Internet-based distributor of small parts for the repair and restoration of pinball machines. In 2007, Marco discovered that one of its customers, Brett Davis, had the ability to design certain new replacement circuit boards for pinball machines. An owner of Marco, Marc Mandeltort, urged Davis to form Legacy Circuit Upgrades, LLC (LCU) to produce and sell these products. Marco planned to advertise these products under the name "PINSCORE."

On October 30, 2007, Marco and LCU entered into an agreement for the production and sale of PINSCORE products. The pertinent terms of this agreement are as follows. In a provision with the heading "EXCLUSIVITY," LCU granted to Marco "worldwide exclusive rights to market, distribute, advertise and sell any amusement machine related devices, circuit boards and inventions developed by LCU." In exchange, Marco agreed to pay to LCU royalties at the end of each month in the amount of 7% of the gross sales price of PINSCORE products. Further, LCU retained ownership of all intellectual property regarding "PINSCORE branded and related products developed by LCU," including any "designs, drawings, software, and patents." In a provision with the heading "NON-COMPETE," the parties agreed that "[n]either party will disclose or profit (monetarily or otherwise) from company confidential information, trade secrets or customer lists." Finally, the term of the agreement was to be 5 years, extending between November 1, 2007 and November 1, 2012.

In general, it appears the parties performed under the contract as follows. When Marco placed an order with LCU, LCU would have a third-party, Triad Electronic Technologies

(Triad), manufacture the PINSCORE products for Marco. When the order was complete, Marco would take delivery of and pay LCU for the products. LCU would then pay Triad, presumably pursuant to a purchase order between LCU and Triad. At the end of each month, Marco would pay LCU a 7% royalty of the PINSCORE products sold.

Marco purchased PINSCORE products from LCU for approximately two years. At one point, however, Mandeltort and Davis formed a joint venture, Disruptive Technologies (Disruptive), to attempt to integrate production of the circuit boards, and Marco conducted most of its PINSCORE purchasing through Disruptive (rather than LCU) during 2008. Ultimately, however, Disruptive was not successful and LCU continued to have Triad manufacture the circuit boards. Also, in January of 2010, Davis formed LCE. Although LCE was ostensibly a new legal entity, its owner, email and physical addresses, phone number, and bank account number were identical to that of LCU. Marco continued dealing with LCE as it did with LCU, and Marco purchased from and issued invoices to LCE. LCU was administratively dissolved in March of 2011. However, the parties never amended their 2007 contract to reflect the change.

In an email exchange in May of 2011, Marco and LCE discussed the ability of LCE to develop and sell products other than PINSCORE, such as an LED display. Another email exchange in October of 2011 evidences planned discussions regarding a new product that LCE was developing, referred to as "XPIN," which would be similar to the PINSCORE product. Mandeltort testified that, on October 6, 2011, LCE informed Marco that the XPIN product had been in development and, although it was not yet available publicly, the XPIN product was in the possession of several vendors and would be available for resale soon. On or about October 13, 2011, it appears that the parties held a telephone conference to discuss at least the XPIN product list and prices.

In late October 2011, however, Marco decided not to purchase the XPIN products, and it instead threatened to sue LCE for breach of contract. More particularly, in a telephone conference with LCE on October 27, 2011, Marco indicated that by providing the XPIN product to third-party vendors for resale, LCE was in breach of their contract's exclusivity provision. Still, Marco offered to forego litigation on the following terms: Marco would honor the contract through the remainder of its term (i.e., it would continue to pay royalties for the sale of PINSCORE products through November 1, 2012) and allow LCE to introduce XPIN to the market *after* the term expired in exchange for LCE agreeing to transfer the intellectual property for the PINSCORE products to Marco. Marco emailed LCE a follow-up outline of the proposed settlement on November 1, 2011.

LCE refused this offer, and its attorney informed Marco of the rejection in writing on November 11, 2011. LCE also informed Marco that XPIN would be released on December 1, 2011. Although LCE continued to communicate with Marco regarding PINSCORE products and customer support, Marco did not respond to LCE's refusal of Marco's offer. Ultimately, LCE authorized its distributors to begin marketing and selling XPIN products on December 19, 2011. In April of 2012, Marco brought the instant suit against LCE.

Marco last placed orders with LCE for PINSCORE products in May of 2011. However, Marco initially refused to take delivery of these products from Triad or pay LCE for these products, the value of which totaled $55,725.31. Even though Marco had not paid LCE for these products, LCE was obligated to Triad for this amount. LCE could not meet this obligation when it came due, though LCE was eventually able to make small payments to Triad on the amount owing. Approximately a year later, in May of 2012, Marco purchased the products it ordered in May of 2011 directly from Triad at cost, $38,837.42 (a difference of $16,887.89).

4

Also, Marco last paid royalties to LCE on sales of PINSCORE products in January of 2012. Marco has sold PINSCORE products since that time, but it has placed the royalty amounts it would have owed LCE under the parties' 2007 contract in escrow with its attorney.

### III.   LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted when a moving party has shown that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). When evaluating a motion under Rule 56, the Court must construe all "facts and inferences to be drawn from the facts . . . in the light most favorable to the non-moving party," *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990), and summary judgment should be granted in those cases where it is perfectly clear that there remains no genuine dispute as to material fact and inquiry into the facts is unnecessary to clarify the application of the law. *McKinney v. Bd. of Trustees of Md. Cmty. College*, 955 F.2d 924, 928 (4th Cir. 1992). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### IV.   DISCUSSION

Three primary claims are at issue in this case: (1) Marco's claim for breach of contract; (2) Marco's claim for breach of contract accompanied by a fraudulent act; and (3) LCE's counterclaim for breach of contract. Each is discussed in detail separately below.

### A. *Marco's Claim for Breach of Contract*

As an initial matter, in its Complaint, Marco alleges that LCE breached the 2007 contract between Marco and LCU by selling its XPIN product to third-party vendors. However, LCE is not an original party to this agreement. Although it appeared from the parties' briefs that there was an issue as to whether LCE should be bound by the terms of the 2007 contract, during the hearing on these motions counsel for LCE indicated that LCE would concede that it is a successor entity to LCU for the purpose of summary judgment. Therefore, in disposing of the pending motions the Court will assume that LCE is bound under the 2007 contract.

LCE advances several arguments as to why the Court should grant it summary judgment on Marco's claims for breach of contract. First, LCE argues that the "exclusivity" provision in the 2007 contract, which grants Marco the exclusive right to purchase, market, and distribute "amusement machine related products" developed by LCU for a period of five years, is in essence a noncompete agreement that is unenforceable under South Carolina law. LCE cites *Carolina Chemical Equip. Co. v. Muckenfuss*, 471 S.E.2d 721, 723 (S.C. Ct. App. 1996), for the proposition that a contractual provision which has the effect of a covenant not to compete is viewed with the same scrutiny as a covenant not to compete. LCE then cites the factors courts consider when determining the enforceability of such agreements, arguing that the agreement at issue here is unnecessary, unlimited in scope, harsh and oppressive, unreasonable from the standpoint of public policy, and not supported by valuable consideration.

LCE's argument is without merit. The exclusivity provision is not a noncompete agreement, but rather a valid contractual provision resulting from arm's length negotiations between contracting parties. Notably, in *J.W. Hunt & Co. v. Davis*, 437 S.E.2d 557 (S.C. Ct. App. 1993), the South Carolina Court of Appeals looked to several factors—including whether

the agreement at issue actually prohibits competition beyond the term of the parties' business relationship and whether there was an employment relationship between the parties—to hold that a provision of a partnership agreement was not a covenant not to compete. *Id.* at 559–60. The partnership agreement in *Davis*, which required a withdrawing partner to pay the partnership liquidated damages if the withdrawing partner serviced a former or existing client of the partnership, was "simply a [contractual] business arrangement incident to the continuing practice of the parties['] respective accounting professions." *Id.* at 560 (quotation marks omitted).

Similarly, the exclusivity provision in the parties' 2007 contract is "nothing more than a term of an ordinary contract," *id.*, and is not subject to traditional covenant not to compete analysis. For example, it is significant that the exclusivity provision does not prevent LCE from competing with Marco *in any way* (i.e., geographically, temporally, or otherwise) beyond the term of the parties' exclusivity. Moreover, there is no employment relationship involved in this case—LCE bargained with Marco for the terms of this contract, and in exchange for granting Marco exclusivity, LCE received, among other things, the right to a 7% royalty on Marco's sale of PINSCORE products to third parties (which products LCE had already sold to Marco). *Muckenfuss*, which was a dispute between an employer and a former employee about whether the employee could divulge his former employer's trade secrets, is fully distinguishable. Further, the Court notes that another provision of the parties' 2007 contract not at issue in this case actually bears the heading "NON-COMPETE," whereas the provision at issue has the heading "EXCLUSIVITY." Therefore, it appears to the Court that the contract had the precise effect the parties intended.

Next, LCE argues that the parties' 2007 contract is illusory and unsupported by consideration. In particular, LCE emphasizes that although Marco received the exclusive right to

7

purchase all of LCE's "amusement machine related products," the 2007 contract did not expressly obligate Marco to purchase *any* product from LCE, and Marco could have purchased similar products from other companies. Thus, according to LCE, there is no mutuality of obligation.

Although the 2007 contract does not impose on Marco an express obligation to purchase a specific volume of products, the contract may impose other express obligations on Marco which may constitute valuable consideration. And even if the contract did not impose *any* express obligation on Marco, this fact alone would not be dispositive. For example, this case closely resembles the famous case of *Wood v. Lucy, Lady Duff-Gordon*, 118 N.E. 214 (N.Y. 1917), wherein Justice Cardozo held that a contract granting the plaintiff an exclusive right to sell the defendant's designs in exchange for half of the profits from the sales was not illusory for lack of consideration. Justice Cardozo found that, in such a contract, there is an implied agreement that the plaintiff would use all reasonable efforts to market the defendant's designs, even though the plaintiff was not expressly obligated to do so; "the acceptance of the exclusive agency was an assumption of its duties." *Id.* at 214. The South Carolina Supreme Court recognized this principle in *Commercial Credit Corp. v. Nelson Motors, Inc.*, 147 S.E.2d 481, 483–85 (S.C. 1966). The case involved a contract between an automobile dealer and a finance corporation which dealt with rights and liabilities of parties after repossession of automobiles from obligors on installment contracts. The contract did not obligate the finance corporation to make collection on installment contracts, but the supreme court held that there is in every contract an implied obligation of good faith and fair dealing and that the finance corporation was impliedly obligated to pursue collection of accounts with reasonable diligence. *Id.* at 485. Accordingly, under the 2007 contract of the parties in this case, Marco was impliedly obligated

to use reasonable efforts to market and sell LCE's PINSCORE products. For at least this reason, therefore, the contract is not void for lack of consideration.

LCE also argues that the Court should grant it summary judgment on this claim because Marco has failed to present any evidence of damages. In particular, LCE notes that Marco is primarily seeking lost profits from LCE's sales of XPIN products as damages,[2] but Marco admitted in its deposition that it could not (at least at that time) quantify its lost profits. Rather, Marco testified that its lost profits include the gross revenue from the sale of *all* XPIN products which may have occurred during the term of the parties' 2007 contract. LCE emphasizes that lost profits are not synonymous with gross revenue and that Marco must at least subtract its overhead costs (including, e.g., marketing and storage costs). In any event, LCE argues that Marco also admitted that its sales of PINSCORE products have been stable, and thus it is not clear that any profits were lost, because the market could have been expanding. Finally, LCE notes that Marco has not presented an expert witness to quantify its lost profits or lost market share. In sum, LCE argues that this represents a complete failure of proof as to an element of Marco's case, and thus LCE should receive summary judgment regardless of whether LCE breached the exclusivity provision of the parties' 2007 contract.

Nevertheless, Marco responds that it has presented a theory of lost profit damages which a reasonable jury could credit. Specifically, Marco has argued and LCE will concede for the purpose of summary judgment that LCE's XPIN product is essentially identical to the PINSCORE product. Marco attached to its Response in Opposition LCE's invoices showing sales of XPIN products to third parties, all of which occurred during the period of exclusivity of

---

[2] Marco mentioned several other types of damages in its 30(b)(6) deposition, including research and development investments in PINSCORE products and a loss of goodwill. LCE argues that Marco has presented no evidence of and cannot quantify these damages, either. Marco did not contest LCE's arguments on these types of damages in its Response in Opposition to LCE's Motion for Summary Judgment or at the hearing on January 11, 2013, and thus the Court will not address them here.

9

the parties' 2007 contract (i.e., before November 1, 2012), totaling approximately $83,000. In Marco's view, then, because the XPIN product is identical to the PINSCORE product, a sale of an XPIN product during the exclusivity period represents a lost sale of a PINSCORE product. Accordingly, by subtracting from the total the amount of royalty Marco would have had to pay to LCE on this amount of sales of PINSCORE products, Marco asserts that it can indeed quantify its lost profits at trial.

It appears to this Court that Marco has submitted sufficient evidence to create an issue of fact as to whether it is entitled to damages, and in what amount. If the XPIN product is indeed functionally the same product as PINSCORE, then the calculation of lost profits described above *could be found* by a trier of fact to be a valid measure of actual damages. It is true that this may not be the *exact* measure of actual damages Marco sustained; markets are not static, and LCE is likely correct that Marco would need to subtract its overhead costs from the total to accurately measure the profit, rather than the gross revenue, lost. Nevertheless, to survive a motion for summary judgment, Marco need only show that its lost profits can be "measured from the evidence produced with reasonable certainty." *Collins Music Co. v. Ingram*, 357 S.E.2d 484, 486 (S.C. Ct. App. 1987); *see also Petty v. Weyerhaeuser Co.*, 342 S.E.2d 611, 615 (S.C. Ct. App. 1986) (stating, in the context of a tort action, that the "problematic nature of proving damages for loss of profits . . . will not prevent recovery where, as here, the Plaintiff can make 'fair and reasonable approximation of them.'" (citation omitted)). Therefore, LCE is not entitled to summary judgment on Marco's claim for breach of contract based on the argument that Marco has failed to provide evidence of damages.

### *B. Marco's Claim for Breach of Contract Accompanied by a Fraudulent Act*

Marco also brought a claim against LCE for breach of contract accompanied by a fraudulent act. In its motion for summary judgment, LCE first argues that this claim fails as a matter of law for the same reasons it argued Marco's claim for breach of contract fails. As discussed above, however, these reasons are not persuasive. Still, LCE also argues that it is entitled to summary judgment on this claim for the independent reason that Marco has failed to provide evidence of a fraudulent act.

More particularly, as LCE notes, to establish a claim of breach of contract accompanied by a fraudulent act, "a party must show: (1) a breach of contract; (2) fraudulent intent relating to the breaching of the contract and not merely to its making; and (3) a fraudulent act accompanying the breach." *D.R. Horton, Inc. v. Wescott Land Co.*, 730 S.E.2d 340, 354 (S.C. Ct. App. 2012) (citation omitted). A "fraudulent" act is "broadly defined as any act characterized by dishonesty in fact or unfair dealing." *Id.* (internal quotation marks omitted). Further, the "fraudulent act may be prior to, contemporaneous with, or subsequent to the breach of contract, but it must be connected with the breach itself and cannot be too remote in either time or character." *Id.* (internal quotation marks omitted).

In this case, LCE argues that Marco has failed to present any evidence that LCE committed a fraudulent act accompanying LCE's alleged breach of the 2007 contract. LCE points out that, in its deposition, Marco admitted that the sole fraudulent act alleged is Davis's dissolution of LCU and formation of LCE in 2010. Marco alleges that LCE did this in an effort to avoid the exclusivity provision of the parties' 2007 contract, but it provides no additional evidence in support of this allegation.

The Court agrees with LCE that Marco has failed to show a fraudulent act accompanying LCE's breach of the 2007 contract.  Although the reason(s) for which Davis created LCE are not of record in this case, as LCE notes, Marco was fully aware of the formation of LCE and has been doing business with LCE since its formation.  Further, Marco and LCE's relationship was identical to the relationship between Marco and LCU.  In other words, there exists nothing except unsupported speculation that creation of the new entity LCE involved any dishonesty in fact or unfair dealing.

Based on the above, LCE is entitled to summary judgment on Marco's claim for breach of contract accompanied by a fraudulent act.

### C.  *LCE's Counterclaim for Breach of Contract*

In LCE's counterclaim for breach of contract, LCE asserts that it is entitled to relief for several different types of damages.  First, LCE alleges that Marco failed to pay to LCE royalties totaling $7,174.18 on sales of PINSCORE products since January of 2012.  Also, LCE alleges that Marco has caused it damage by failing to pay certain "unpaid invoices and related amounts." In particular, LCE states that in May of 2011, Marco contracted with LCE to purchase $55,725.31 worth of PINSCORE products.  LCE had its third party manufacturer, Triad, manufacture these products for Marco, but Marco initially refused to take possession of the products.  LCE alleges that Marco breached this contract with LCE by purchasing these products directly from Triad at cost, $38,837.42 (a difference of $16,887.89).  LCE also asserts that Marco owes certain other amounts for "past due invoices associated with PinScore products in the amount of $10,041.22," for "consigned PinScore component and circuit board inventory being held at Triad in the amount of $10,358.32," for "the amount given by LCE to Triad for XPin invoices that was actually applied by Triad to PinScore invoices after April 1, 2012 in the

12

amount of $8,764.65," and for "overstock of PS-2518-21/58 Red and Green units built to meet Triad and Forge Europa minimum order quantities in the amount of $13,986.87." Def.'s Mot. Summ J. Counterclaims 3, ECF No. 42.

To evaluate LCE's counterclaim, the Court must first look to the terms of the contract Marco is alleged to have breached. However, LCE appears to assert that it is entitled to relief for some or all of these damages under two different contracts. The first contract is the parties' 2007 contract. The second contract is one LCE alleges was formed pursuant to the purchase orders exchanged between it and Marco and their prior dealings. The terms of this alleged second contract are that "LCE would design, procure and sell products to [Marco] for resale by [Marco] under the PINSCORE label in exchange for payment of a 7% royalty of [Marco's] PINSCORE sales." Def.'s Mot. Summ. J. Counterclaims 1–2. As LCE notes, "[t]his arrangement is similar to that which is set forth in the 2007 Agreement," *id.* at 2, but without the exclusivity provision. LCE argues that because this contract involved the sale of goods, it falls within the scope of South Carolina's Commercial Code, including Section 2-204, which permits a contract to be made in any manner sufficient to show agreement. *See* S.C. CODE ANN. § 36-2-204. The Court will determine the applicability of each contract in turn.

Regarding the parties' 2007 contract, LCE asserts it is entitled to relief thereunder only for the royalty damages. LCE acknowledges that Marco has failed to pay the royalties on the basis that LCE did not abide by the exclusivity provision in this contract. However, LCE argues that the exclusivity provision is void, and thus it does not justify Marco's withholding royalties. Further, LCE argues that the remaining provisions of the 2007 contract continue to be enforceable.

13

LCE is incorrect. As explained in detail above, the exclusivity provision is valid and the 2007 contract is enforceable, and thus LCE is not entitled to summary judgment on Marco's claim for breach of contract against LCE. If LCE is found to have breached the 2007 contract, LCE's breach would have suspended any duty of performance required of Marco. Said another way, under this contract, Marco is only required to pay royalties as long as it has the exclusive ability to purchase LCE's products. If LCE destroyed the exclusivity with its breach, then Marco is no longer obligated to pay royalties. Therefore, LCE is not entitled to summary judgment on its claim that Marco breached the parties' 2007 contract.

Regardless, LCE appears to argue that it is entitled to recover all of the damages outlined above under the alleged second contract. LCE contends that this second contract was formed by the parties' conduct, including the exchange of purchase orders for PINSCORE products and their prior dealings. This is a confusing argument, to say the least. The conduct which is alleged to establish this second contract appears to be simply the parties' course of performance under their 2007 contract. However, LCE nowhere argues that the entirety of the parties' 2007 contract is unenforceable. And in any event, as discussed above, the parties' 2007 contract is valid and enforceable.

LCE has cited no authority, and it appears to the Court that there is none, for the proposition that parties to a valid first contract can create a second contract, the terms of which overlap substantially with those of the first, based on the parties' course of performance under the first contract. Thus, the Court finds that the parties' conduct did not form a second contract as described by LCE and that LCE is not entitled to recover under this theory.[3] It is true that the

---

[3] The Court notes that, even if LCE had shown the existence of a second contract, it would still not be entitled to summary judgment on its claim for the "unpaid invoices and related amounts." This is because the only evidence adduced in favor of this claim consists of a conclusory affidavit of Brett Davis, the owner of LCE.

14

individual purchase orders exchanged between the parties are contracts themselves, but these are not before the Court, and the Court expresses no opinion thereon.

Accordingly, the Court finds that LCE is not entitled to summary judgment on its counterclaim for breach of contract.

## V.    CONCLUSION

Based on the foregoing, this Court hereby grants, in part, and denies, in part, LCE's motion for summary judgment on Marco's claims. In particular, LCE is entitled to judgment as a matter of law on Marco's claim for breach of contract accompanied by a fraudulent act. However, the Court finds that there are genuine issues of material fact with respect to Marco's claim for breach of contract and that LCE is not entitled to judgment as matter of law. Additionally, the Court hereby denies LCE's motion for summary judgment on its counterclaim.

This case will be calendared for trial during the term of court beginning March 12, 2013.

IT IS SO ORDERED.

January 17, 2013                                                            Joseph F. Anderson, Jr.
Columbia, South Carolina                                              United States District Judge

15